## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

------------------------------------- X

IRTH SOLUTIONS, LLC                          :

               Plaintiff,                  :

      -against-                          :

APEX DATA SOLUTIONS AND SERVICES,   :
LLC (d/b/a "DigTix") and KYLE MURPHY,

            Defendants.                  :

------------------------------------- X

Civil Action No.  6:18-cv-06884

**DEMAND FOR JURY**

## COMPLAINT

irth Solutions, LLC ("Plaintiff" or "irth"), by and through its undersigned counsel, alleges for its Complaint against Defendants Apex Data Solutions and Services, LLC (d/b/a "DigTix") ("Apex") and Kyle Murphy (collectively, "Defendants") as follows:

## I.    INTRODUCTION

1.    This action arises out of Defendants' willful and deliberate theft of Plaintiff's valuable trade secrets, including but not limited to confidential and proprietary information relating to the development, structure, and functionality of Plaintiff's industry-leading software-as-a-service platform ("SaaS") named DigTrack. Defendants obtained Plaintiff's trade secrets and confidential information by inducing at least three of Plaintiff's customers to provide Defendants with unauthorized access to DigTrack in violation of the customers' contractual obligations to Plaintiff. The unauthorized access and subsequent theft of information enabled Defendants to quickly build a more robust, functional, and customized version of a competing web-based

software application called DigTix,[1] which, in turn, was used to steal the very three customers that facilitated Defendants' unauthorized access. Defendants continue to market the "new and improved" DigTix—with improvements resulting from Defendants' misappropriation—to Plaintiff's customers.

2.     Now that Defendants' misconduct has been uncovered (although the full extent of their wrongdoing is not yet known), Plaintiff seeks to hold Defendants accountable and stop them from further exploiting Plaintiff's trade secrets and confidential information by putting an immediate halt to the substantial and irreparable harm that Defendants have caused, and continue to cause, as a result of their unlawful activities, and by seeking monetary damages.

3.     Through this lawsuit, Plaintiff seeks injunctive relief and recovery of damages that it has suffered as a result of Defendants': (1) misappropriation of Plaintiff's trade secrets, under both the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b)(1), and New York law; (2) tortious interference with Plaintiff's contractual relations with its customers and former customers; (3) acts of unfair competition; (4) unjust enrichment at Plaintiff's expense; and (5) conversion of Plaintiff's trade secrets and confidential information. Unless Defendants' actions are halted, Plaintiff will suffer irreparable damage, and Defendants' improper actions will encourage other companies to violate the rights of true innovators without themselves investing in the research and development necessary to innovate independently.

## II.     PARTIES

4.     Plaintiff is an Ohio corporation, with its principal place of business located at 5009 Horizons Drive, Columbus, Franklin County, Ohio 43220.

---

[1]     Although no formal entity with this name exists, Defendants also market their company as DigTix.

5.      Upon information and belief, Apex is an Ohio corporation, with its principal place of business located at 7135 Linn Lane, Middletown, Ohio 45044.

6.      Upon information and belief, Mr. Murphy is an individual who resides in California.  Upon information and belief, Mr. Murphy is the founder and president of Apex and the person chiefly responsible for Apex's DigTix software.

7.      Upon information and belief, Defendants are and were at all times the agents, affiliates, partners, assignees, or principals of each other or otherwise responsible for or participated in the performance of the wrongful acts alleged herein, and thereby are jointly and severally responsible for such acts and incurred liability therefore.

## III.    JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 because this case arises under 18 U.S.C. §§ 1836, et seq.  The Court has supplemental jurisdiction over Plaintiff's remaining common-law claims under 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over Defendants pursuant to N.Y. CPLR § 302(a).  Plaintiff's servers that contain and host the DigTrack application are located in Rochester, New York and are used in interstate commerce. Defendants have therefore committed tortious acts within New York and Defendants expected or reasonably should have expected their acts to have consequences in New York.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events, acts, omissions, and injuries giving rise to the claims occurred in this judicial district and because Defendants are subject to personal jurisdiction in this judicial district at the time this action commenced.

## IV.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.    Background Regarding the Contract Locator Industry.

11.    To protect vital underground utilities, and to avoid interruption of vital services, property damage, and personal injury, excavators must provide a protection service ("the 811/One Call Center") with proposed locations and times of excavation before beginning a job. In response, the 811/One Call Center generates a work order, called a "dig ticket" or "ticket," to notify all subsurface utility, pipeline, and other subsurface asset owners that may have lines or other underground assets in the general location.

12.    After receiving a "ticket," the utility must physically mark the location of its lines at the excavation site within a specified time period.  Once the location is marked, the ticket is closed.  Once all issued tickets are closed, the utility owner has fulfilled its obligation to identify assets in the excavation area and digging can begin.

13.    Utilities and other asset owners typically contract with companies called "contract locators" to identify and mark locations in response to a ticket.  The success of a contract locator's business depends upon its ability to efficiently and profitably manage the tickets received on behalf of its clients.  This in turn requires the contract locator to effectively manage its "in the field" workforce based on ticket volume, ticket locations, and relevant deadlines to ensure that its workforce is properly allocated so that tickets are closed within the specified time.  If a contract locator fails to visit and properly mark a location within the relevant time frame, and injury or damage results from striking an underground pipeline at the excavation site, then the utility company could incur significant legal and financial liability.  Utility companies thus rely on contract locators to manage their tickets in a timely and productive fashion, which proves difficult

given the high volume of tickets generated by 811/One Call Centers.  Indeed, DigTrack processes an average of approximately one million tickets per month on behalf of irth's clients.

      **B.**    **irth's Pioneering and Market-Leading DigTrack Software Solution.**

     14.    irth provides market-leading field service management solutions to the utility, energy, and telecommunications industries.  irth delivers state of the art cloud-based software products that empower businesses of all sizes in these industries to optimize growth and performance by automating and streamlining workforce management and field operations.

     15.    On or about October 31, 2017, irth acquired the assets of Bytronics, Inc. ("Bytronics"), a company based in Rochester, New York.  At the time, Bytronics provided similar software solutions to the energy, utility, municipality and contract locator industries.  Through that purchase, irth acquired Bytronics' DigTrack web-based software product, which was, and still is, run from servers located in Rochester, New York.[2]

     16.    DigTrack is a comprehensive tool that enables municipalities, utilities, pipelines, and contract locating firms to efficiently and profitably manage their dig tickets and other business operations, such as billing and damage reporting.

     17.    irth developed DigTrack in 1990 (then called "SRMS") and, in its first decade of its existence, deployed the platform as an installed system at the customer site, which customers principally consisted of contract locators.

     18.    In 2000, irth rewrote the entire application to be a software as a service ("SaaS")-based web application.  By the end of 2000, all existing customers were migrated to the new web

---

[2]    From here on, for ease of discussion, Bytronics and irth will be referred to only as "irth" or "Plaintiff."

platform, called DigTrack.  DigTrack was one of the first ever "webified" or "internet enabled" ticket management applications and a pioneering product in this field.

19.    The current web-based version of DigTrack is the embodiment of almost thirty years of research and development.  The platform's user interface (*i.e.*, the application features with which users interact) sets DigTrack apart from the competition, which has been historically scarce.  While many aspects of the DigTrack user interface have remained substantially the same since 2000, irth has continuously innovated and developed new and improved features and capabilities over the past 18 years that provide contract locators with ever-increasing functionality and control over their workflows, billing, and damage response initiatives.

20.    irth often customizes its software modules at a customer's request to tailor the platform to a customer's specific needs, which can require significant time and expense.  Indeed, irth has expended substantial resources since 2000 developing and fine tuning DigTrack's proprietary system architecture, design, efficiency, and customization, which give irth its competitive advantage to acquire and retain its client base.  Because of the functionalities and experience provided, DigTrack is recognized as the leading application on the market today in this space.

### C.    The Trade Secrets Comprising irth's DigTrack System.

21.    irth is the sole owner and proprietor of all right, title, and interest in and to certain trade secrets and confidential information relating to the DigTrack System and its underlying structure and algorithms.  Specifically, the DigTrack source code, system architecture, and user interface have been and still are closely maintained by irth as trade secrets.  This includes, individually or in combination, the DigTrack system's unique functionalities, graphical display and design, system architecture, various components and modules, logic flows, databases, access

methods, supporting programs and systems, and related data and software schemas and models, methods and properties, and any scripts developed in conjunction with software customizations (the "Trade Secrets").

22.     DigTrack consists of numerous modules (program parts related to discrete tasks), which make it more than just a ticket tracking application.  These modules query and assemble a wide-range of back-end data to produce workflows, reports, and other real-time information in the DigTrack user interface that are critical to the management of a contract locator's business.  These modules are often customized to meet a customer's specific needs and to help a customer meet its client's (*i.e.*, utility company) needs, which further increases the product's utility and strengthens irth's customer relationships.

23.     Some examples of these modules include:

   a. **Time Reporting Module.**  Acts as a digital punch clock for customer employees.  This includes supervisor time approval, detailed time reports, exporting of time records, etc.

   b. **Quality Control Audit Module**.  Organizes and tracks  routine, random audits on locators in the field to ensure they are following proper procedures relating to site visitation and ticket treatment.

   c. **End-to-End Damage (Incident) Investigation Module.**  Contract locators can identify excavation site damage issues as they arise, incorporate photos and other information and track incidents through resolution by their clients.

   d. **Billing Module.**  Enables invoices to be easily created and tracked.  This highly functional module allows contract locators to organize billing to their

clients in comprehensive, customizable tables that incorporate often complex billing rules, ticket details and other information.

24.    In addition to the source code that underlies these and other DigTrack software modules, irth maintains trade secrecy in the unique combination of DigTrack system features and user interface elements that drive its commercial value in the contract locator industry.

25.    Contract locating companies rely heavily on the unique features built into the DigTrack application to run their businesses.  From the time a dig ticket is received until it is invoiced, DigTrack helps contract locators manage and track their operations.

26.    irth has customized DigTrack to specifically cater to the needs of contract locating industry by, among other things, offering the following exemplary features and functionality, which took considerable resources and know-how to develop and bring to market:

a.    The separation of customer accounts into "crews" (or "teams") that allow for ticket workflow to be managed and tracked most efficiently.

b.    After-hours ticket and emergency ticket notification with escalation to managers or supervisors when locators do not respond after a specified number of attempts.

c.    "On-call" assignment scheduling by areas to allow rotation of locators for after-hours emergency tickets.  Users can define rules for assigning after-hours tickets to locators based on work schedules with assignment start and end times.

d.    Photo attachment to document marked tickets and damage reports (e.g., street markers at location sites).

e.  Over 100 reporting tools that allow users to generate reports providing various business-critical data, such as locator productivity, ticket volumes, tickets due by date, revenue by customer, revenue by locator, damage causes, and high profile tickets.

**D.    irth's Persistent and Continuous Efforts to Protect its Trade Secrets from Disclosure to Competitors.**

27.    The Trade Secrets are not, and have never been, in the public domain and irth has undertaken significant effort, time, expense, and other resources to develop and maintain their confidentiality. The only people that can properly access the DigTrack program are paying customers bound by strict confidentiality provisions and restrictions on unauthorized use and copying.

28.    irth licenses DigTrack to contract locators for its use, and each license agreement ("License Agreement") binds the contract locators to confidentiality, non-disclosure, and non-use obligations.  A true and correct copy of the License Agreement is attached hereto as **Exhibit A**. These clear and unambiguous License Agreement restrictions have remained largely unchanged since the inception of the DigTrack platform.

29.    Specifically, the license to use DigTrack requires that the customer agree to restrict the program's use to authorized employees and not to provide log-in credentials to third-parties, make unauthorized copies of DigTrack documentation, or reverse engineer the software:

**7.0 LICENSE GRANT**

BYTRONICS hereby grants to the CLIENT, and the CLIENT hereby accepts, subject to the terms and conditions set forth in this Agreement, a non-exclusive and non-transferable right to use the DigTrack System along with DigTrack Documentation as set forth in this Agreement. The term "license" as used in this Agreement shall mean and include:

1. The right to use the Internet based DigTrack System by authorized employees of the CLIENT only.

2. The right to use and copy the DigTrack Documentation for the CLIENT's internal operations at licensed locations.

3. The right to contact BYTRONICS for support requests relating to the DigTrack System as described in this Agreement.

7.1     In accepting the license granted by BYTRONICS, the CLIENT agrees that it shall:

1. Not provide access to any third-party using CLIENT IDs and passwords.

2. Control user access by non authorized or former employees of the CLIENT.

3. Not make copies of the DigTrack System Documentation or outputs for any purpose not expressly set forth in this Agreement.

4. Not attempt to disassemble, reverse engineer, or undermine the DigTrack System Software.

30.    Furthermore, by means of the License Agreement, licensees expressly acknowledge that DigTrack and all of its underlying components are composed of trade secrets and agree to hold DigTrack in the utmost confidence and not disclose its contents to any unauthorized third-party:

**11.0 NON-DISCLOSURE**

The CLIENT acknowledges that the DigTrack System and components that comprise it, the pricing and terms of this Agreement, are trade secrets of BYTRONICS and that if it is used in any manner not expressly authorized by this Agreement, BYTRONICS will suffer immediate and irreparable harm. Therefore, the CLIENT agrees that in any case of such unauthorized use or disclosure, BYTRONICS shall be entitled to an injunction against such unauthorized use or disclosure, in addition to any other rights or remedies to which it may be entitled. BYTRONICS shall be entitled to the costs and fees of any such action including but not limited to actual attorneys fees incurred. The CLIENT agrees that it shall hold the licensed DigTrack Software (including methods or concepts utilized therein, system manuals, and screen designs) in confidence and not disclose to anyone except to employees of the CLIENT, its affiliates, and parent companies to whom such disclosure is necessary. The CLIENT shall appropriately notify all employees to whom any such disclosure is made in confidence and shall be kept in confidence by them.

31.    Further, as a condition of, and in consideration for, employment with Plaintiff, Plaintiff requires employees to enter into employment agreements at the commencement of their employment that include confidentiality, non-disclosure, and non-use obligations.

32.    The Trade Secrets are of great value to irth and were developed through significant effort time, expense, and other resources. Since DigTrack's web-based launch in 2000, at any given time, there have been at least two full time employees, and sometimes more (and as many as seven), dedicated to DigTrack's development. Said another way, for the last 18 years, at least two developers have been working full time to improve and refine the DigTrack platform to provide the most powerful service to irth's contract locator customers.

33.    The Trade Secrets cannot easily be duplicated by others attempting to create them from scratch. The Trade Secrets also provide irth with an advantage over current and prospective market competitors. Thus, irth takes the above-described measures to prevent the Trade Secrets from entering competitors' hands, so that competitors cannot unjustifiably reap the benefits of irth's years of labor and innovation. irth would lose its well-earned competitive advantage if its

11

Trade Secrets became known to competitors who otherwise would have to invest significant time and expense developing such information independently.

      **E.**      **Defendants Target irth Customers to Unlawfully Acquire and Use irth's Trade Secrets for Defendants' Own Commercial Benefit.**

34.      Apex (which appears to do business as "DigTix") has directly competed against irth since 2012 through its similarly-named software called DigTix. Defendant Murphy is the President of Apex who, in publicly available demonstrations published on the DigTix website and YouTube, describes himself as "Lead Project Manager and Engineer for Digtix" who has "his hands in a little bit of everything whether it's on the engineering side or the sales and business development side." Although Apex is a competitor, it has not (until recently) made any significant market inroads.

35.      Upon information and belief, Defendants realized they lacked the knowledge, insight, and vision to independently develop DigTix into a successful product like DigTrack using their own resources and therefore, sometime before January 2018, Defendants schemed to address that deficiency and accelerate their product development efforts by misappropriating those critical missing assets from Plaintiff.

36.      Upon information and belief, and unbeknownst to Plaintiff, Defendants targeted at least three of Plaintiff's customers using the DigTrack platform—Diversified Underground ("Diversified"), S&S Utilities ("S&S"), and Atlantic InfraTrac, LLC ("Atlantic") (collectively, the "Former Customers")—seeking to gain access to critically sensitive trade secrets and confidential information regarding DigTrack.

1.    **The Diversified Logins and Malicious Attacks**

37.    Unbeknownst to irth, sometime before January 12, 2018, Murphy induced Diversified to breach its License Agreement and provide him with a Diversified account and login credentials.  Indeed, on January 12, a Diversified user account with the first name "Kyle" and last name "Murphy" was created.  That day, Murphy unlawfully accessed DigTrack through his unauthorized Diversified credentials and began his extended and systematic exploration of DigTrack, including its architecture, modules, overall functionality, and user interface.

38.    Murphy logged in again on January 15, 2018, exploring DigTrack for almost two hours.  Near the conclusion of his session, Murphy took his intrusion to the next level and attempted no less than eight malicious Structured Query Language ("SQL") injection attacks into the DigTrack System.  SQL injection can be utilized as a web attack mechanism to gain access to a database.  SQL injections exploit weaknesses in data handling of the web applications when given unexpected input..  This exploitation allows users to inject SQL commands into web applications such as login forms to run commands as if interfacing with the database directly.  In less technical terms, SQL injections typically involve typing SQL computer code into the fields of a website's fillable form.  For example, instead of entering the information a website's form requests one to enter (such as one's name, address or credit card number), one could enter a technical code that is interpreted by the server and executes commands on the user's behalf.

39.    Through the SQL injections, Murphy targeted the tables storing customer data within DigTrack, as well as the identities of all of irth's customers and information about them. Unfortunately for Defendants, Murphy was unsuccessful.

40.    Undaunted by his failed SQL injection attack, on January 16, 2018, Murphy launched a new and different mission to steal irth's Trade Secrets.  Murphy logged in again and,

13

using an often malicious computer program called "Wget," quickly copied what was effectively the entirety of the DigTrack application to Murphy's local disk or other external location. Defendants copied at least 550 unique files from the DigTrack application.

41.    Between January 15 and January 30, 2018, Murphy logged into DigTrack using the Diversified credentials on at least seven days and explored the DigTrack platform and architecture.

42.    On January 30, 2018, Murphy's Diversified account was deleted because, as irth would only later learn, the account was no longer needed.  Through his exploration and Wget attacks, Murphy evidently secured the information he needed to modify and enhance the existing DigTix platform in a manner that would provide Diversified with functionality that could compete with (*i.e.*, mimic) DigTrack.

43.    Days later, on February 6, 2018, Diversified notified irth that it was terminating its contract with irth and would be "switching to a new system."  Upon information and belief, that "new system" was DigTix.

### 2.    The S&S Account and Atlantic Account Logins

44.    On February 22, 2018,  again unbeknownst to irth, a new "Kyle Murphy" account was created under the credentials of another customer, S&S.  Through these credentials, Murphy again gained unauthorized access to DigTrack, logging in on multiple days over a five-month period between February and June 2018 to explore the application as it had been customized for S&S.  Again, Murphy achieved his objective.  In June 2018—the same time period in which Murphy's S&S logins ceased—S&S provided a notice of termination and advised irth that it would no longer be using DigTrack.  Upon information and belief, S&S is now using DigTix.

45.    On September 13, 2018, a third set of login credentials were created for Murphy—***using Murphy's DigTix email address***—under yet another customer's account, Atlantic.  Through

these credentials, Murphy again gained unauthorized access to DigTrack, logging in on multiple days between September and November 2018 to explore the DigTrack application as it was customized for Atlantic, with the same end result: in late-September 2018, Atlantic notified irth that it was terminating its agreement under the terms of the License Agreement.  Upon information and belief, Atlantic also now uses DigTix.

46.     After the unexpected and unprecedented loss of a third customer to a competitor in such a short timeframe, irth evaluated all aspects of the customer relationships to identify a cause, including reviewing the customers' activity on the platform. Only then did irth discover that a direct competitor may have been logging into the system over a period of months via customer-supplied credentials.  irth immediately began a more detailed investigation and hired a forensic expert to further investigate.

### 3.     Defendants' Commercial Exploitation of irth's Trade Secrets

47.     Following Defendants' unlawful acquisition of irth's Trade Secrets, Defendants' subsequent use and incorporation of the Trade Secrets into DigTix are evident from Murphy's collusion with irth's Former Customers, the extensive copying and exploration of DigTrack by means of unauthorized access and malicious software hacks, and the Former Customers' timely terminations.  But Defendants' commercial exploitation of the Trade Secrets is even more directly evidenced by Murphy's own brazen advertisement of DigTix on his website.

48.     Since the time of Defendant's acquisition and theft of the Trade Secrets, the DigTix website has touted numerous "new" features that were previously "not part of DigTix's offerings," but that function in the same way and achieve the same result as features that DigTrack offered.

49.     For example, in a February 18 blog post, roughly one month after Murphy's first unauthorized Diversified login, Defendants "announce[d]" the delivery of two highly requested

features: "Photo Documentation," and "Incident Tracking." In that regard, the February 18 blog post discusses a "new photo documentation window" that allows users to quickly take photographs of the work site," and enables photos to be "automatically compressed, uploaded, and attached to that ticket." The February 18 blog post further states that "DigTix now has the ability to track and manage incidents," which enables users "to create, view, investigate, annotate, and resolve incidents."

50.     At the time of the February 18 blog post, irth had long offered both the photo capability and incident tracking features to Diversified. Indeed, DigTrack's ticket management process has incorporated photocapability for over 10 years, and has had the ability to capture photos using a smartphone for approximately 6 years, functionally similar to the process described and shown on the DigTix website and blog. DigTrack had similarly offered a Damage (also known as Incident) Investigation and Tracking Module to customers for over 15 years. Like the "new" DigTix feature, the a Damage Investigation and Tracking Module allows customers to input, investigate, and track damages to a root cause.

51.     Eight months later, on November 14, 2018, shortly after Murphy's unauthorized Atlantic logins, Defendants announced the release of DigTix v2.15. Not surprisingly, the November 14 blog post touted additional new DigTix features, including an alert feature that was similar to what DigTrack customized for Atlantic. Like DigTrack, DigTix could now send alert messages sent to locators if defined conditions are met, and repeat those message attempts if the recipient does not respond.

52.     The November 14 blog post also announced the roll-out of a "Teams (and Team Productivity)" feature on DigTix, in which "[u]sers may now be defined as belonging to a team." Defendants further promoted "[a] new category of quick filter allows managers to quickly view

due date performance and navigate from team to team." DigTrack, however, has incorporated the "team" feature for over 15 years, and it has proven to be a critical component that enables large customers—that employ many locators, across numerous regions—to properly manage and monitor ticket workflow. And irth's DigTrack system already provided for "productivity reports" that can be generated and filtered by team to allow for more targeted and efficient locator supervision.

53.     Finally, the November 14 blog by Defendants boasted that:

> [t]icket assignment can now be scheduled into the future. The upcoming assignment schedule is displayed in the "Ticket Assignment" section of the Administration panel. Red assignment entries are currently active, black assignment entries are scheduled for the future.

This too appears to have been lifted directly from DigTrack. irth had custom-developed an "on-call" future assignment schedule in DigTrack for Atlantic that very closely resembles this description. This DigTrack function allows users to define rules for assigning after-hours tickets to locators based on a schedule with assignment start and end times. Although DigTix is described as using red to denote an active assignment entry, while DigTrack uses green, the exact same functionality is achieved.

54.     Without stealing irth's Trade Secrets and confidential information, Defendants would not have been able to develop the DigTix program as it currently exists, and certainly not with the same speed. Furthermore, irth does not know what safeguards—if any—Defendants have enacted to prevent further dissemination of irth's Trade Secrets beyond Defendant's own DigTix platform.

55.     irth has suffered irreparable injury as a result of Defendants' wrongful acts as alleged above, including but not limited to, loss of the goodwill associated with the DigTrack

program.  Unless restrained by the Court, this injury is likely to continue.  irth will suffer irreparable harm if Defendants are permitted to continue using the Trade Secrets acquired during Murphy's unauthorized invasions of the DigTrack system by (a) using and marketing any version of the DigTix system that includes irth's Trade Secrets, or (b) otherwise continuing to enhance or customize Defendants' directly competing, and commercially inferior, DigTix program based on irth's Trade Secrets.

**FIRST CAUSE OF ACTION**
**Violation of the Defend Trade Secrets Act  ("DTSA")**
**(18 U.S.C. §§ 1836, et seq.)**
***(Against All Defendants)***

56.    irth alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 55 above.

57.    irth is the owner of the Trade Secrets contained in and relating to its DigTrack System.  irth can bring a civil cause of action under 18 U.S.C. § 1836(b)(1) because the Trade Secrets are related to irth's products and services, which are used in or intended for use in interstate commerce.

58.    Defendants misappropriated the Trade Secrets by knowingly acquiring the Trade Secrets through improper means; namely, by accessing the DigTrack platform without authorization using credentials supplied by irth's customers in breach of their contractual duties to restrict the program's use to authorized employees, not provide log-in credentials to third-parties, and maintain the secrecy of the Trade Secrets.

59.    Defendants also misappropriated the Trade Secrets by disclosing and using the Trade Secrets without irth's express or implied consent after knowingly using improper means to acquire knowledge of the Trade Secrets.  Specifically, as detailed above, Defendants used the

18

Trade Secrets to modify and enhance their commercially inferior DigTix product to steal irth's customers.

60.    The Defendants' acquisition, use and disclosure of the Trade Secrets further constitutes misappropriation because at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived from or through persons (*i.e.,* the Former Customers) who owed a duty to irth to maintain the secrecy, and limit the use of, the Trade Secrets.

61.    Other than through Defendants' improper disclosure, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure and/or use.

62.    irth has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by, among other things, requiring confidentiality and/or nondisclosure agreements to be signed by licensees granted access to irth's Trade Secrets, requiring the use of passwords, and limiting the access afforded to customer employees based on the nature of each employee's role. irth took similar strict confidentiality measures with its own employees and contractors that had access to the Trade Secrets.

63.    irth's confidential and proprietary Trade Secrets are of substantial economic value and have provided irth with a competitive advantage.

64.    Defendants have and will continue to misappropriate irth's Trade Secrets by continuing to enhance or customize Defendants' directly competing, and commercially inferior, DigTix program based on irth's Trade Secrets. By so doing, Defendants have used irth's proprietary Trade Secrets without permission and in violation of the Former Customers' confidentiality obligations.

65.    Defendants' misappropriation comprises acts, including without limitation use of irth's Trade Secrets, on or after the date of the enactment of the DTSA.

66.    Defendants' current and continued misappropriation of irth's Trade Secrets is reckless and malicious.  Defendants knew of the confidentiality, ownership, and use restrictions on the Trade Secrets, which the Former Customers agreed to abide by in signing their User Agreements, and further knew their access was unauthorized.

67.    As a direct and proximate result of Defendants' misappropriation of irth's Trade Secrets, Defendants have caused and will continue to cause irth substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its Trade Secrets and business.  Defendants have been unjustly enriched by their misappropriation of irth's Trade Secrets.

68.    Defendants' misappropriation of irth's Trade Secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive.  irth is entitled to an award of exemplary damages and reasonable attorneys' fees.

69.    Because irth's remedy at law is inadequate, irth seeks—in addition to damages— temporary, preliminary, and permanent injunctive relief to protect its Trade Secrets as well as irth's legitimate business interests.  irth will continue to suffer irreparable harm absent injunctive relief.

<u>SECOND CAUSE OF ACTION</u>
**Common Law Misappropriation of Trade Secrets**
(*Against All Defendants*)

70.    irth alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 69 above.

71.    irth is the owner of the Trade Secrets contained in and relating to its DigTrack System.  irth has taken reasonable steps to maintain the secrecy of its Trade Secrets, including by,

among other things, requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to irth's Trade Secrets, requiring the use of passwords, and limiting the access afforded by such passwords based on the nature of each employee's role.  irth took similar strict confidentiality measures with its own employees and contractors that had access to the Trade Secrets.  Other than through Defendants' improper disclosure, the Trade Secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure and/or use.  irth's confidential and proprietary Trade Secrets are of substantial economic value and have conferred a competitive advantage on irth.

72.     Defendants have shown a pattern of strategically targeting irth's customers to gain access to the Trade Secrets to bypass the time, effort, and substantial industry know-how required to create a software solution that offers comparable features, functionalities, and benefits to DigTrack.

73.     Defendants misappropriated the Trade Secrets by knowingly acquiring the Trade Secrets through improper means and by using the Trade Secrets as described above.  Such actions constitute misappropriation of trade secrets under common law.

74.     As a direct and proximate result of Defendants' misappropriation of irth's Trade Secrets, Defendants have caused and will continue to cause irth substantial injury, including, but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its Trade Secrets and business. Defendant has been unjustly enriched by his misappropriation of irth's Trade Secrets.

75.     Defendants' misappropriation of the irth's Trade Secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive. irth is entitled to an award of exemplary damages and reasonable attorneys' fees.

76.     Because irth's remedy at law is inadequate, irth seeks—in addition to damages—temporary, preliminary, and permanent injunctive relief to protect its Trade Secrets as well as irth's legitimate business interests.  irth will continue to suffer irreparable harm absent injunctive relief.

### THIRD CAUSE OF ACTION
**Common Law Tortious Interference With Contractual Relations**
(*Against All Defendants*)

77.     irth alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 76 above.

78.     As detailed above, irth and each of the Former Customers entered into contracts containing *inter alia* confidentiality and use restrictions prohibiting the disclosure of irth's Trade Secrets.

79.     Plaintiff fulfilled all of its obligations pursuant to those agreements.

80.     Defendants were aware of the existence of those agreements and the obligations they imposed on the Former Customers.

81.     Although the Former Customers agreed to be bound by the confidentiality provisions, Defendants intentionally induced the Former Customers to breach those contractual responsibilities by providing Defendants with access to DigTrack and by inducing the Former Customers to disclose irth's Trade Secrets for purposes expressly prohibited by those agreements.

82.     Defendants' actions in inducing those breaches of contract were and are without justification, intentional and illegal, and have been engaged in for the specific purpose of inducing the Former Customers to breach their agreement with irth.

83.     The Former Customers breached their contractual obligations by, among other things, providing Defendants with access to DigTrack and by disclosing irth's Trade Secrets and other confidential proprietary information to Defendants.

22

84.     As a proximate result of Defendants' tortious interference with contractual relations, irth has been damaged, and Defendants unjustly enriched, in an amount to be determined at trial.

85.     Upon information and belief, Defendants intend to continue to interfere with irth's business existing and prospective business relationships unless restrained and enjoined by this Court.

## FOURTH CAUSE OF ACTION
### Common Law Unfair Competition
### (Against All Defendants)

86.     irth alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 85 above.

87.     irth devoted substantial amounts of effort, time, expense, and other resources to the development of its Trade Secrets.  irth has employed persistent and continuous efforts to maintain the secrecy of the Trade Secrets, including by binding the parties that can properly access the DigTrack program by strict confidentiality provisions and restrictions on unauthorized use and copying. These confidential and proprietary Trade Secrets, which belong exclusively to irth, are of substantial economic value and have conferred a competitive advantage on irth.

88.     Defendants misappropriated the Trade Secrets by knowingly acquiring the Trade Secrets through improper means, namely, by obtaining unauthorized login information to access the DigTrack platform.  This access would not be possible without Defendants inducing the Former Customers to breach their duty to maintain the secrecy of the Trade Secrets and not to provide third parties with access. Defendants also misappropriated the Trade Secrets by disclosing and using the Trade Secrets without irth's express or implied consent after knowingly using improper means to acquire knowledge of the Trade Secrets.

89.     Defendants' acquisition, use and disclosure of the Trade Secrets constitutes misappropriation because at the time of such use and disclosure, the Defendants knew or had reason to know that their knowledge of the Trade Secrets was derived from or through persons (*i.e.,* the Former Customers) who owed a duty to irth to maintain the secrecy, and limit the use of, the Trade Secrets.

90.     Defendants have misappropriated irth's property (*i.e.*, irth's Trade Secrets) to unfairly compete against irth by (a) using and marketing versions of the DigTix system that includes irth's Trade Secrets, and (b) continuing to enhance or customize Defendants' directly competing, and commercially inferior, DigTix program based on irth's Trade Secrets.  Unless enjoined by this Court, Defendants' acts of unfair competition will continue and irth will continue to suffer irreparable harm.

91.     In addition, by virtue of Defendants' unfair competition, irth is entitled to compensatory and punitive damages in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### Common Law Unjust Enrichment
### (*Against All Defendants*)

92.     irth realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 91 above.

93.     Defendants have been enriched and have benefited from their use of irth's Trade Secrets by, for example, accelerating development of its own competing product and gaining an unfair commercial advantage over irth.

94.     Defendants have been enriched at irth's expense, as irth has devoted substantial amounts of time, effort, money, talent, and creativity to the development of the Trade Secrets.

95.     Given Defendants' inequitable misconduct, as alleged above, including its intentional and knowing misappropriation of irth's Trade Secrets for the purpose of exploiting and utilizing the Trade Secrets for their own benefit, equity and good conscience require restitution.

96.     Because Defendant's misconduct was intentional, knowing, willful, malicious, fraudulent, and oppressive, irth is entitled to an award of exemplary damages and reasonable attorneys' fees.

## SEVENTH CAUSE OF ACTION
### Common Law Conversion
#### (*Against All Defendants*)

97.     irth realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 96 above.

98.     Without irth's consent or authorization, Defendants have wrongfully and intentionally exercised dominion and control over irth's valuable intellectual property—*i.e.*, its Trade Secrets—by converting the Trade Secrets to their own use.

99.     Defendants have misappropriated irth's Trade Secrets and used it for their own benefit, by means that include, but are not limited to, Defendants' unlawful acquisition of irth's Trade Secrets through Murphy's unauthorized log in sessions and Defendants' subsequent use and incorporation of the Trade Secrets into Defendants' directly competing, and commercially inferior, DigTix program.

100.    Defendants' tortious and illegal conduct has interfered with irth's rights of possession in the Trade Secrets and have severely harmed irth in its business, by virtue of, *inter alia*, (1) loss of competitive advantage in the industry and (2) loss of customers and potential future customers.

101.    By reason of the foregoing, Defendants have converted irth's valuable property, and are directly and proximately liable to irth in an amount to be determined at trial.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable by right.

## DEMAND FOR RELIEF

Plaintiff requests that the Court find in its favor and against Defendant, and that the Court grant Plaintiff the following relief:

          a.      Preliminarily and permanently enjoining Defendants, Defendants' agents, employees and licensees, and all persons or entities in active concert or participation with Defendants from:

          i.      accessing Plaintiff's DigTrack software-as-a-service platform ("DigTrack") using login credentials supplied by Plaintiff's current or former customers (or anyone else), or by any other means;

          ii.      operating any version of the Defendants' DigTix system that post-dates January 11, 2018, or providing any such version to third parties for use;

          iii.      marketing any version of the DigTix system that post-dates January 11, 2018;

          iv.      reviewing, consulting, or viewing any files, screenshots or other materials copied from Plaintiff's DigTrack system manually, by use of Wget software, or by any other means; and

          v.      developing, coding, programming, modifying, improving or creating any technology or functionality derived from, based on or including any information obtained from irth's systems.

          b.      Awarding damages as described in each of the above claims, in favor of Plaintiff and against Defendant in amounts to be determined at trial;

          c.      Awarding punitive damages in favor of Plaintiff and against Defendant in an amount to be determined at trial;

          d.      Awarding Plaintiff pre-judgment and post-judgment interest, and its attorneys' fees, costs and other expenses incurred in this action;

EAST\162900467.1

e.    Granting Plaintiff such other and further relief as the Court may deem just and proper under the circumstances.

DATED: December 6, 2018

DLA PIPER LLP (US)

By: /s/ *Matthew Ganas*_____
Matthew N. Ganas
matt.ganas@dlapiper.com
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone (212) 335-4500
Facsimile (212) 335-4501

William L. Bartow (*pro hac vice pending*)
William.Bartow@dlapiper.com
Brian M. Robinson (*pro hac vice pending*)
Brian.Robinson@dlapiper.com
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, Pennsylvania 19103-7300
Telephone (215) 656-3300
Facsimile (215) 656-3301

*ATTORNEYS FOR PLAINTIFF IRTH SOLUTIONS, LLC*

EAST\162900467.1