UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IRTH SOLUTIONS, LLC,

                              Plaintiff,

v.
                                                          Case # 18-CV-6884-FPG

                                                            **DECISION AND ORDER**

APEX DATA SOLUTIONS AND SERVICES,
LCC (d/b/a "DigTix"), and KYLE MURPHY

                              Defendants.

## INTRODUCTION

Plaintiff irth Solutions, LLC brings this action against Defendants Apex Data Solutions and Services, LLC d/b/a "DigTix," and its owner, Kyle Murphy, asserting six claims for 1) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 2) common law misappropriation of trade secrets, 3) tortious interference with contractual relations, 4) unfair competition, 5) unjust enrichment, and 6) conversion. ECF No. 1. Simultaneously with its Complaint, Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion"). ECF Nos. 5, 6.

In response, Defendants filed a Motion to Dismiss or Transfer Venue (ECF No. 26) and an Omnibus Memorandum of Law in Opposition to Plaintiff's TRO Motion and Motion to Dismiss or Transfer Venue. ECF No. 32.

The Court held a hearing on January 8, 2019, at which it reserved ruling on both motions. This Decision and Orders resolves those motions.

## BACKGROUND

Plaintiff irth and Defendant Apex are competitors who both offer web-based software programs that help utility companies manage "dig tickets." Dig tickets notify utility companies and other underground asset owners of excavation jobs that will impact their property. When a utility receives a dig ticket, it must physically mark the location of its assets at the excavation site to protect the assets and avoid interruption of services. To manage the dig tickets, utilities engage "contract locators" to identify and mark locations in response to a ticket. The contract locators, in turn, rely on software such as that offered by the parties in this case to successfully manage and process the dig tickets.

Plaintiff's dig ticket management program, "DigTrack," was developed in 1990 by Robert Dreste, the founder of a company called Bytronics, Inc., in Rochester, New York. In October 2017, irth, an Ohio corporation, acquired Bytronics, but Robert Dreste and other former Bytronics employees continue to operate DigTrack from the Rochester, New York area.

Defendants' dig ticket management program, "DigTix," was developed in 2012. Although Apex is incorporated in Ohio, it is wholly owned by Kyle Murphy, a California resident.

The dispute in this case arose when, between February and September 2018, Plaintiff lost three customers. Plaintiff investigated and reviewed the three customers' activity on DigTrack and discovered that Kyle Murphy, using his own name, had been logging into DigTrack using credentials supplied by each of the three customers. Plaintiff hired a forensic expert to conduct a more detailed investigation and found that Murphy had logged in to DigTrack multiple times between January and September 2018, copied 550 files from DigTrack using a program called "Wget," and attempted to obtain more data from DigTrack using a Structured Query Language ("SQL") injection, which is a mechanism that can be used to gain access to a database.

Plaintiff also noticed that, shortly after Murphy's logins during January 2018, on February 18, 2018, Murphy published a blog post on DigTix's website announcing newly available features—features which were already offered by DigTrack. Similarly, after Murphy's logins between February and November 2018, on November 14, 2018, Murphy published another blog post announcing more new features which DigTrack already offered. Plaintiff then filed its Complaint and TRO Motion in this Court on December 6, 2018.

In response, Murphy admits that he logged in to the three customers' DigTrack accounts but explains that he only did so to determine what customer-owned data was available to migrate to DigTix and to "retrieve that data in a consistent, structured format." ECF No. 27, ¶ 25. He points to the fact that he logged in using his own name as evidence that he had no intent to steal any of DigTrack's trade secrets. He also submits evidence demonstrating that the features Plaintiff claims DigTix copied from DigTrack were already under development at DigTix in 2017, ECF Nos. 27, ¶ 28-29; 27-1; 27-3, and that the features were not secret, but were offered and publicly advertised by DigTrack and other industry competitors. ECF Nos. 27, ¶¶ 41-43; 27-4.

In response to Plaintiff's Complaint and TRO Motion, Defendants filed an Omnibus Response in Opposition and Motion to Dismiss or Transfer Venue. The Court turns to the Motion to Dismiss or Transfer first.

## MOTION TO DISMISS OR TRANSFER VENUE

Defendants request dismissal or transfer of this action to the Southern District of California because Murphy resides in California. Defendants argue that this Court lacks personal jurisdiction over Defendants and that, even if the Court has jurisdiction, venue is neither proper nor convenient in this Court. For the reasons set forth below, Defendants' Motion to Dismiss or Transfer Venue is DENIED.

## I. Motion to Dismiss for Lack of Personal Jurisdiction

> To determine personal jurisdiction over a non-domiciliary in a case involving a federal question, here the Defend Trade Secrets Act ("DTSA"), the Court must engage in a two-step analysis. First, the Court applies the forum state's long-arm jurisdiction statute, and if that statute confers jurisdiction, it determines, second, whether personal jurisdiction comports with the Due Process Clause of the United States Constitution.

*Medicrea USA, Inc. v. K2M Spine, Inc.*, No. 17 CIV. 8677 (AT), 2018 WL 3407702, at *4 (S.D.N.Y. Feb. 7, 2018) (internal citations and quotations omitted).

### A. Jurisdiction Under New York's Long-Arm Statute, Section 302(a)

"[L]ong-arm jurisdiction . . . exists over a defendant only when the claims relate to the defendant's contacts with New York. Long-arm jurisdiction is provided for in Section 302 of the C.P.L.R." *Hume v. Lines*, No. 12-CV-6378-FPG-JWF, 2016 WL 1031320, at *10 (W.D.N.Y. Mar. 8, 2016) (internal citations omitted).

Section 302(a) provides four bases of jurisdiction over non-domiciliary defendants. Section 302(a)(1) confers jurisdiction over a non-domiciliary defendant who "transacts any business within the state or contracts anywhere to supply goods or services in the state." Section 302(a)(2) confers jurisdiction over a non-domiciliary defendant who "commits a tortious act within the state." Section 302(a)(3) confers jurisdiction over a non-domiciliary defendant who, among other requirements, "commits a tortious act without the state causing injury to person or property within the state." Section 302(a)(4) confers jurisdiction over non-domiciliary defendant who owns, uses or possesses any real property in New York.

Here, Plaintiff's Complaint alleges that Defendants committed a tortious act in New York under 302(a)(2) by improperly accessing DigTrack, which is hosted on Plaintiff's Rochester-based servers. ECF No. 1, ¶ 9.

Defendant's Motion to Dismiss correctly argues that "[a] defendant must have been physically present in New York to have committed the tortious act 'within the state' for the purposes of § 302(a)(2)." *Covanex, Inc. v. Duvvada*, 14-CV-6050-FPG, 2015 WL 8375211, at *3 (W.D.N.Y. Dec. 8, 2015). Murphy's contact with Plaintiff's servers in New York from his computer in California does not amount to physical presence in New York under section 302(a)(2). *See Delfasco, LLC v. Powell*, 52 Misc. 3d 689 (N.Y. Sup. Ct. 2016).

In response to Defendants' Motion to Dismiss, Plaintiff suggests that this Court instead has personal jurisdiction pursuant to sections 302(a)(1) and (3). The Court finds that it has jurisdiction under section 302(a)(1).

Section 302(a)(1) requires not only that a defendant transact business in New York, but also that the cause of action arise from defendant's New York business transactions. *See Interface Biomedical Labs. Corp. v. Axiom Med., Inc.*, 600 F. Supp. 731, 737 (E.D.N.Y. 1985). In other words, there must be "some articulable nexus between the business transacted and the cause of action sued upon." *Medicrea*, 2018 WL 3407702, at *7 (quoting *McGowan v. Smith*, 52 N.Y.2d 268, 272 (1981)). "This element does not require a causal link between the defendant's New York business activity and a plaintiff's injury, but rather a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former." *Id.*

Here, Plaintiff argues that Defendants transact business in New York because they launched DigTix in New York, market DigTix to New Yorkers, and license DigTix to at least one New York customer. "Section 302(a)(1) is a 'single act' statute, meaning that proof of a single act or transaction is sufficient to confer personal jurisdiction." *Centrifugal Force, Inc. v. Softnet Commc'n, Inc.*, No. 08 CIV.5463 CM GWG, 2009 WL 1059647, at *4 (S.D.N.Y. Apr. 17, 2009).

Plaintiff argues that Defendants' licensing of DigTix—allegedly incorporating Plaintiff's trade secrets—to the New York customer gives rise to Plaintiff's claims in this action.

The Court agrees with Plaintiff and has received no argument from Defendants to the contrary. The Court acknowledges that, under the briefing schedule set in advance of the January 8, 2019 hearing, Defendants did not have the opportunity to reply to Plaintiff's response in opposition to Defendants' Motion to Dismiss. However, the Court offered both parties the opportunity to conduct additional briefing during the hearing, and both parties declined. Defendants do not dispute that they launched DigTix in New York, market DigTix to New Yorkers, and license DigTix to a New York customer. The Court finds that this creates an "articulable nexus" between Defendants' New York business transactions and Plaintiff's claims. Thus, the Court exercises personal jurisdiction under section 302(a)(1).

### B. Due Process Considerations

> Having found personal jurisdiction under New York law, the Court must ensure that an exercise of jurisdiction would not offend the Due Process Clause of the U.S. Constitution, which "protects a person without meaningful ties to the forum state from being subjected to binding judgments within its jurisdiction." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). The exercise of jurisdiction over non-domiciliary defendants is constitutional where defendants have "certain minimum contacts" with the forum state and the maintenance of a suit does not offend "traditional notions of fair play and substantial justice." *Id*. at 577 (quoting *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945)).

*Medicrea*, 2018 WL 3407702, at *7. "The minimum contacts inquiry substantially overlaps with the transaction of business inquiry." *Id.*

Here, Defendants argue that the presence of Plaintiff's servers in Rochester is insufficient to establish minimum contacts with New York. But in *Medicrea*, the court considered the defendants' accessing of servers in New York as a factor weighing in favor of personal jurisdiction in New York. *Id*. Further, Defendants ignore their other contacts with New York, including their

6

launching, marketing, and licensing of DigTix in New York. The Court finds that the same facts that establish the transaction of business also establish minimum contacts here. *See id.*

Defendants make no argument as to the "fair play and substantial justice" prong of the due process analysis other than to reiterate their contention that the presence of the servers in Rochester is insufficient. Plaintiff argues that several factors weigh in favor of this Court's exercise of personal jurisdiction, including (1) the burden on Defendants, (2) the interests of the forum state, and (3) Plaintiff's interest in obtaining relief.

As to the first factor, while Defendant Murphy resides in California, the burden on a defendant to litigate in another forum carries little weight given the conveniences of modern communication and transportation. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002). "The inconvenience . . . cuts both ways since all of [Plaintiff's] witnesses would have to travel to California if the case were brought there." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 172 (2d Cir. 2010). As to the second factor, New York has an interest in providing Plaintiff redress in this action. Although Plaintiff is incorporated in Ohio, its predecessor, Bytronics, was based in and developed DigTrack in Rochester, Plaintiff continues to operate DigTrack from the Rochester office and maintains Rochester employees, and Robert Dreste, the developer of DigTrack and a material witness, resides in Rochester. The third factor favors New York for the same reasons.

Accordingly, the Court finds that the exercise of personal jurisdiction pursuant to section 302(a)(1) comports with due process, and Defendants' Motion to Dismiss is DENIED.

## II. Motion to Transfer Venue

Defendants argue that even if this Court determines that it can exercise personal jurisdiction over them, venue is neither proper in New York under 28 U.S.C. § 1391(b) nor convenient under

7

28 U.S.C. § 1404(a). Defendants therefore request that this Court transfer venue to the Southern District of California, in which Murphy resides.

## A. Propriety of Venue in this Court

Defendants argue that Plaintiff has not alleged that any significant events occurred in New York but merely relies on the presence of Plaintiff's servers in Rochester to establish venue here. *See* 28 U.S.C. 1391(b) (providing that venue is proper in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred). But acquiring trade secrets by accessing a server in New York can be a significant event for venue purposes. *See Argent Funds Grp., LLC v. Schutt*, No. 3:05 CV 01456 SRU, 2006 WL 2349464, at *2 (D. Conn. June 27, 2006) (finding that substantial events material to a misappropriation claim occurred in Connecticut where non-Connecticut defendant accessed a Connecticut server to steal confidential information). This Court similarly finds that venue is appropriate here.

## B. Convenience of Venue in this Court

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Here, Defendants argue that this action might have been brought in the Southern District of California, where Murphy resides and was physically located when he allegedly misappropriated Plaintiff's trade secrets, and that the interests of justice and convenience of the parties favors a transfer there.

Whether the interests of justice and the convenience of parties and witnesses favor transfer is guided by several factors, including (1) plaintiff's choice of forum, (2) convenience of the witnesses, (3) location of evidence, (4) convenience of the parties, (5) locus of the operative facts, (6) ability to compel the attendance of witnesses, (7) relative means of the parties, and (8) trial

efficiency and the interests of justice. *See NY. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 112 (2d Cir. 2010).

As to the first factor, a plaintiff's choice of venue should not be disturbed unless the balance of convenience and justice "tips heavily in favor of transfer." *Izkhakov v. Educ. Comm'n for Foreign Med. Graduates,* No. 12 Civ. 348, 2012 WL 2861338, at *3 (S.D.N.Y. July 10, 2012). Here, the factors, at best, shift the inconvenience from one party to another, so venue should remain in New York.

As to the second, third, and fourth factors, the witnesses, evidence, and parties are spread throughout New York, Ohio, and California, so these factors are neutral.

As to the fifth factor, the locus of operative facts is arguably in New York where the trade secrets at issue were located. *See Argent Funds*, 2006 WL 2349464, at *7 ("The claim arises from the plaintiff's alleged acts of accessing confidential information that resided on the file server in Connecticut . . . ."); *cf. Constr. Tech., Inc. v. Lockformer Co.,* 704 F. Supp. 1212, 1215 (S.D.N.Y. 1989) (where defendant allegedly misappropriated confidential information to develop a product in one state but advertised the resulting product in another state, the court held that "[t]his is thus one of those unusual cases in which it is not clear that the claim arose in any one district" and that the plaintiff could choose among districts with equal plausibility in terms of venue).

As to the sixth factor, since witnesses are located across several states, the ability to compel their attendance is neutral.

As to the seventh factor, both parties acknowledge that Plaintiff is a larger company which likely has greater means, but neither party elaborates on the extent of their means or the hardship that litigating in their unwanted forum would cause.

9

Finally, as to the eighth factor, while Murphy resides California, Plaintiff's founder and predecessor company is based in New York and continues to operate DigTrack from New York. There is no indication that litigating in the Southern District of California would be any more efficient or just than in this Court, so this factor is neutral.

Accordingly, Defendants' Motion Transfer Venue is DENIED. The Court now turns to Plaintiff's TRO Motion.

## MOTION FOR TRO/PRELIMINARY INJUNCTION

### I. Standard for a Preliminary Injunction and TRO

"Temporary restraining orders and preliminary injunctions are extraordinary and drastic remedies." *Rush v. Hillside Buffalo, LLC*, 314 F. Supp. 3d 477, 483-84 (W.D.N.Y. 2018). They should not be granted "unless the movant, by a clear showing, carries the burden of persuasion." *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d. Cir. 1985).

> In the Second Circuit, [a] party seeking a preliminary injunction must demonstrate: (1) a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction.

*Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 510 (S.D.N.Y. 2017) (internal citation and quotations omitted). "The standard for an entry of a TRO is essentially the same as for a preliminary injunction." *Free Country Ltd. v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016). TROs and preliminary injunctions are never granted as of right but are granted in the sound discretion of the district court. *Id.*

**A. Likelihood of Success on the Merits**

While Plaintiff's Complaint asserts several causes of action, Plaintiff only seeks a TRO and preliminary injunction with respect to its misappropriation of trade secrets claims, so the Court limits its analysis to those claims as well.

Plaintiff has not shown a likelihood of success on the merits as to its trade secrets claims because it has not adequately identified the trade secrets it wishes to protect. Plaintiff's description of its trade secrets and its accusations of what Defendants copied from DigTrack focus on the various "features" or "modules" that are offered in the DigTrack program. However, Plaintiff admits that these "features" or "modules" are not trade secrets because they are publicly advertised on Plaintiff's own website, and because competitors in the industry offer these features as well.

What Plaintiff really seeks to protect is the "unique combination" of DigTrack's system, architecture, and user interface: "the way that DigTrack's robust suite of features are configured, organized, and presented for users in the DigTrack platform, and the way that such features interact and can be cross-utilized to provide a unique user experience and commercially successful end product." ECF No. 35 at 5. This includes DigTrack's

> source code, system architecture, and user interface. . . . [and] individually or in combination, the DigTrack system's unique functionalities, graphical display and design, system architecture, various components and modules, logic flows, databases, access methods, supporting programs and systems, and related data and software schemas and models, methods and properties, and any scripts developed in conjunction with software customizations.

ECF No. 1, ¶ 21. Unlike the general ideas of DigTrack's "features" or "modules," the DigTrack program as a whole is not available to the public and is protected by confidentiality and non-disclsoure agreements that Plaintiff requires its customers to sign.

In general, the "unique combination" of a software program's system, architecture, and user interface is protectable. *See Integrated Cash Mgmt. Servs., Inc. v. Dig. Transactions, Inc.*,

11

920 F.2d 171, 174 (2d Cir. 1990) (finding that "the architecture of [plaintiff's software program], or the way in which [the program's] various components fit together as building blocks in order to form the unique whole" was protectable because "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."); *LinkCo, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 499 (S.D.N.Y. 2002) ("The architecture of a software program may . . . be a trade secret where only a limited amount of technical detail about the program is disclosed to the public."); *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 17-3511, 2018 WL 6518798, at *2 (2d Cir. Dec. 11, 2018) (*Next II*) ("[C]omputer software programs that contain components that are generally not known by outsiders have received judicial recognition as trade secrets."); *Broker Genius*, 280 F. Supp. 3d at 515 ("[T]he elements of a software's UX/UI can be a trade secret so long as the only people who can access them are bound by a duty to keep them confidential."); *Fabkom, Inc. v. R.W. Smith & Assocs., Inc.*, No. 95 CIV. 4552 (MBM), 1996 WL 531873, at *6 (S.D.N.Y. Sept. 19, 1996) ("Both the underlying source code, and the architecture of a computer program, may qualify as trade secrets."); *Harbor Software, Inc. v. Applied Sys., Inc.,* 887 F. Supp. 86, 90 (S.D.N.Y. 1995) ("[T]he overall design of a software program may be protectable as a trade secret, even if the individual components of that program are common knowledge in the programming industry.").

However, Defendants argue—and this Court agrees—that here, Plaintiff has not described this "unique combination" in sufficient detail to enable the Court to determine whether it merits protection.

> While neither the New York Court of Appeals nor the United States Court of Appeals for the Second Circuit has expressly required trade secrets to be identified with any particular degree of specificity, it is evident that a "vague and indefinite" piece of information cannot be protected as a trade secret.

*Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d at 515. Courts have held that compilation trade secrets, such as software programs, must be described "*with sufficient specificity* that its protectability can be assessed and to show that its compilation is unique." *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-CV-8190 (RJS), 2016 WL 1275659, at *3 (S.D.N.Y. Mar. 30, 2016) (*Next I*) (quoting *Sit-Up Ltd. v. IAC/ InterActiveCorp.*, No. 05-cv-9292 (DLC), 2008 WL 463884, at *10 (S.D.N.Y. Feb. 20, 2008)); *Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-CV-5540 (KBF), 2018 WL 557906, at *4 (S.D.N.Y. Jan. 23, 2018) (same); *see also DS Parent, Inc. v. Teich*, No. 5:13-CV-1489 LEK/DEP, 2014 WL 546358, at *7 (N.D.N.Y. Feb. 10, 2014) ("A party seeking a preliminary injunction must identify with specificity the protectable interests at issue.").

In *Next II*, the Second Circuit held that the plaintiff failed to identify a protectable trade secret in its software program where the plaintiff did not provide any information showing *how* its software program worked as a whole, the way in which the programs features were interrelated, or the method of making the program work. 2018 WL 6518798, at *3. Although the plaintiff submitted declaration evidence and a PowerPoint presentation purporting to demonstrate how the software worked, the PowerPoint slides consisted of "vague labels, rudimentary graphics, and high-level concepts" which "fail[ed] to convey any information about the logical relationship between the operations, data structures, and software [plaintiff] alleges combine to form a trade secret." *Id.*

Here, Plaintiff's description of the "unique combination" of DigTrack's system, architecture, and user-interface is similarly lacking. Instead of focusing on these elements, Plaintiff primarily describes the "modules" and "features" which Plaintiff admits are not trade secrets.

Plaintiff does submit under seal a Second Declaration of Robert Dreste, in which Dreste describes two of DigTrack's features in greater detail and incorporates screen shots in an attempt to demonstrate how these features look, work, and interact. But it is not clear that these screenshots are any more enlightening than the information included in the PowerPoint Presentation in *Next II*, and the Declaration only provides examples of two out of over 25 features and over 100 reports offered in DigTrack.

Plaintiff also fails to describe how its system, architecture, and user-interface is unique. While "novelty—at least as that term is used in patent law—is not required in a trade secret," s*ee Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc*., 118 F.3d 955, 968 (2d Cir. 1997), a trade secret claimant must "show that its compilation is unique." *Next I*, 2016 WL 1275659, at *3.

For example, in *Broker Genius*, the court found that, no matter how generic certain components of plaintiff's software program were, plaintiff had arranged them into a "unique and synergistic system architecture" which was "the only tool on the market" when defendant allegedly misappropriated plaintiff's trade secrets. 280 F. Supp. 3d at 517. Although the court ultimately rejected plaintiff's trade secrets claim because plaintiff did not keep the software secret, the uniqueness of the software weighed in favor of trade secret protection.

In contrast, in *Sit-up*, the court found that plaintiff failed to raise a triable issue as to its "unique combination" trade secrets claim because plaintiff

> offered no such concrete evidence that its business method uniquely strung together certain elements in a particular way. Rather, [plaintiff] would have the Court infer that, because it ran a successful falling-price auction business, its combination of various, possibly secret, data and business protocols must have been unique. Raising the specter of trade secret appropriation in this manner does not substitute, however, for evidence that the more than one hundred individually identified alleged trade secrets were somehow combined by [plaintiff] to form a unique whole.

2008 WL 463884, at *10.

Similarly, here, Plaintiff has not sufficiently identified these elements and described their uniqueness. "While it is not necessary to disclose every detail of an alleged trade secret in a complaint, [Plaintiff] could have explained that its . . . [software] relies on a specific, proprietary algorithm developed at a certain time and which no one else owns" or it "could have filed a [more detailed] description of the alleged trade secrets under seal." *Elsevier*, 2018 WL 557906, at *6. Since the only elements of DigTrack that Plaintiff describes and accuses Defendants of copying are concededly not secret, this Court cannot identify what, exactly, Plaintiff's trade secrets are or "determine whether they merit protection, let alone craft an injunction specific enough to put Defendants on notice o[f] what information may or may not be disclosed." *Medicrea*, 2018 WL 3407702, at *12.

As Plaintiff has not adequately identified the trade secrets at issue in this case, the Court does not address whether Defendants misappropriated any trade secrets.

### B. Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). To establish irreparable harm, a plaintiff must "demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*

Here, Plaintiff has not established a likelihood of irreparable injury to warrant a TRO or preliminary injunction. Plaintiff argues that if Defendants are permitted to continue developing and enhancing DigTix based on Plaintiff's trade secrets—without having to incur the substantial development costs that Plaintiff expended—then there is a strong likelihood that Plaintiff's current

customers, and potential new customers, will opt for DigTix rather than DigTrack, causing DigTrack to lose its competitive position in the contract locator industry.

Plaintiff's claims are too speculative to warrant a TRO or preliminary injunction. Plaintiff offers no details regarding its "position in the contract locator industry" or how the loss of any given number of customers would affect its market share. Additionally, the fact that the three customers that Plaintiff lost gave their login credentials to Murphy *before* DigTix released any allegedly mimetic features undermines Plaintiff's fear that DigTix used Plaintiff's trade secrets to lure away the three customers (or will continue to lure away any more customers). In fact, Defendants presented declaration evidence from the representatives of the three customers indicating that they left DigTrack because, after irth acquired Bytronics, Plaintiff's customer service, which was very good under Bytronics, faltered. ECF Nos. 29, 30, 31.

Plaintiff also argues that irreparable harm is presumed where a trade secret has been misappropriated. But as Defendants respond, the Second Circuit rejected that argument in *Faiveley*, explaining that a

> rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge.

559 F.3d at 118-19 (internal citations omitted).

Here, Defendants have the same incentive to protect the trade secrets as would Plaintiff.

16

### C. Balance of Hardships and Public Interest

Plaintiff's balance of hardships argument is the same as its irreparable injury argument—that it may lose additional customers to Defendants if Defendants are permitted to continue marketing DigTix using stolen secrets from DigTrack. Plaintiff further argues that any harm Defendant suffers by being enjoined from marketing the mimetic version of DigTix would be self-inflicted and thus insufficient to avoid a preliminary injunction.

Defendants argue that the balance of hardships tips in favor of defendants where a preliminary injunction would prevent it from conducting its ordinary business. *VoiceStream Wireless Corp. v. All U.S. Commc'ns*, 149 F. Supp. 2d 29, 38 (S.D.N.Y. 2001). Defendants also argue that since a disruption in its business would affect its customers and could lead to safety hazards, the public interest factor favors it.

Plaintiff has not demonstrated any hardship beyond the speculative threat of loss of customers and has not explained why an injunction would favor the public's interest.

Because Plaintiff has not established a likelihood of success on the merits, irreparable harm, or that the balance of hardships and public interest favor an injunction, Plaintiff's TRO Motion is DENIED.

### CONCLUSION

For the foregoing reasons, Plaintiff's TRO Motion (ECF No. 5) is DENIED and Defendants' Motion to Dismiss or Transfer Venue (ECF No. 26) is DENIED.

IT IS SO ORDERED.

Dated: January 22, 2019
      Rochester, New York

HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court